**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LOUIS P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 18 CV 8486** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Louis P. ("Claimant") brings a motion for summary judgment to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI"). The Commissioner brings a cross-motion seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons that follow, Claimant's request for summary judgment (Dckt. #17) is granted and the Commissioner's motion for summary judgment (Dckt. #20) is denied.

---

[1] In accordance with Internal Operating Procedure 22 – "Privacy in Social Security Opinions," the Court refers to Claimant only by his first name and the first initial of his last name. Furthermore, Andrew Saul is now the Commissioner of Social Security and is substituted in this matter pursuant to Fed. R. Civ. P. 25(d).

## I. BACKGROUND

### A. Procedural History

On September 15, 2015, Claimant (then 22 years old) filed an application for SSI, alleging disability dating back to his birth on January 25, 1993 due to mental health issues. (R. 15.) Claimant's application was denied initially and upon reconsideration. (R. 96-115.) Claimant filed a timely request for a hearing, which was held on May 2, 2017 before an Administrative Law Judge ("ALJ"). (R. 37-95.) Claimant appeared with counsel and offered testimony at the hearing. Claimant's mother and a vocational expert also offered testimony.

On October 3, 2017, the ALJ issued a written decision denying Claimant's application for benefits. (R. 15-31.) Claimant filed a timely request for review with the Appeals Council. On November 2, 2018, the Appeals Council denied Claimant's request for review, leaving the decision of the ALJ as the final decision of the Commissioner. (R. 1-6.) This action followed.

### B. Medical Evidence in the Administrative Record

Claimant seeks SSI for symptoms and limitations stemming from schizophrenia.[2] The administrative record contains the following evidence that bears on Claimant's claim:

#### 1. Evidence from Claimant's School Records

The record includes Claimant's Individual Educational Plan records from high school. (R. 327-370.) Those records show that Claimant was functioning in the low average range of intelligence and exhibited problems with anxiety, depression, and

---

[2] The administrative record reveals Claimant occasionally sought treatment for physical problems such as skin issues, high blood pressure, and back pain. However, those records are not relevant to Claimant's application for SSI benefits.

social/interpersonal relationships. (R. 328.) Consequently, Claimant received additional support and special education resources during high school. (R. 364.) The school records also reveal that Claimant was hospitalized for two weeks in 2009 due to suicidal ideations. (R. 330.) He was diagnosed with a mood disorder and psychosis, but discontinued taking psychiatric medication after discharge. (*Id*.)

### 2. Evidence from Claimant's Treating Physicians

On June 19, 2014, local police took Claimant to the emergency room after he exhibited erratic behavior in a store. (R. 392.) Specifically, Claimant told people that "he had venom in his veins and was breathing a poison in the environment…trying to kill people." (R. 394.) Upon arrival at the ER, Claimant continued to act erratically and aggressively. (R. 392.) He was admitted involuntarily for inpatient care for severe psychosis. (*Id*.)

During the initial few days of his hospital stay, Claimant was very hostile and refused to talk to medical professionals or take medication. (R. 394-98.) Eventually, Claimant started on Risperdal and began speaking. (R. 397.) Claimant explained that he "gets very irritable" because his "brain is not working." (R. 399.) He was living alone with the financial support of his family because he could not secure a job. (*Id*.) Claimant exhibited "some insight and motivation, but poor interpersonal skills." (*Id*.) His "prognosis remain[ed] guarded depending on compliance [and] support system." (*Id*.) On June 30, 2014, Claimant reported "feeling much better" since starting on Risperdal. (R. 401.) Claimant was discharged on July 1, 2014 and advised to follow-up for mental health treatment with Aunt Martha's health clinic. (R. 402.)

Claimant followed-up with Aunt Martha's clinic the following month and reported improved symptoms. (R. 423.) Claimant underwent a formal psychiatric evaluation at Aunt Martha's in December 2014. (R. 426.) He could not recall why he was admitted to the hospital or what medications he was discharged with. (*Id.*) He reported feeling anxious, but denied psychosis, depressive symptoms, homicidal or suicidal ideations. (*Id.*) He continued to live by himself with financial support from his mother. (*Id.*) The examining psychiatrist described Claimant as cooperative, but guarded, and noted fair concentration, attention, insight, and judgment. (R. 427.) He assessed an asymptomatic mood disorder and recommended further psychological testing and therapy. (R. 427-28.)

On July 15, 2015, local police again brought Claimant to the emergency room after he was observed pacing outside of his apartment and pumping his arms for three to four hours. (R. 451.) Claimant's mother reported peculiar symptoms the past few days and a history of schizophrenia and non-compliance with medications. (R. 456.) Claimant was transferred to Hartgrove Hospital for inpatient care. (R. 409.)

Upon admission to Hartgrove, Claimant remained catatonic and completely mute. (R. 446.) The attending psychiatrist, Dr. Ali, attempted to perform a mental status examination. He described Claimant as disheveled, guarded, anxious, and exhibiting some psychomotor retardation. (R. 446.) Dr. Ali assessed schizophrenia, paranoid type, and planned to start Claimant on oral Invega, followed by an injection. (R. 448.) Over the course of his hospital admission, Claimant took Ativan and Invega and began to come out of his psychosis and catatonic state. (R. 440.) He was discharged on July 28, 2015

with instructions to seek individual therapy and psychiatric care, including monthly Invega injections. (R. 441.)

Claimant established care with psychiatrist Dr. Gorrepati shortly after discharge from Hartgrove. (R. 511.) Claimant could not recall why he was taken to the hospital, but explained that before treatment he could not organize his thoughts or speak fluently. (*Id*.) Claimant stated his current medications kept him "balanced." (*Id*.) Upon exam, Dr. Gorrepati noted a blunted mood and limited judgment and insight. (R. 513.) Dr. Gorrepati assessed schizophrenia, paranoid type, and planned to continue Claimant on Ativan and monthly Invega shots. (R. 511, 514.) By the next month, Claimant reported he was doing "fairly well" with the Invega shots. (R. 521.)

Claimant's mood remained stable in October 2015. (R. 532.) He reported going for occasional walks and enjoyed watching DVDs. (*Id*.) In mid-November 2015, Claimant reported he had been feeling "steady" and explained that his daily Ativan helps calm him down and keeps him motivated. (R. 542.) But a week or so later, Claimant told a nurse practitioner that he had stopped taking all of his medications due to dizziness and nausea and because he felt "he was taking too much medicine." (R. 650.) At each of his appointments in late 2015, Claimant denied audio or visual hallucinations or paranoid ideations. (R. 521, 532, 542.) In early January 2016, Claimant presented to the ER with memory problems and hearing loss after hitting his head. (R. 611.) All findings were normal in the ER, but claimant sought a referral to a specialist for further testing and persistent memory troubles throughout the year. (R. 618.)

Claimant returned to see Dr. Gorrepati in late January 2016. (R. 611.) He had missed his December Invega injection, but received his January dose. (*Id*.) Claimant's

mother told Dr. Gorrepati that Claimant became isolated, anxious, and fearful after missing his December injection.  (*Id.*)  Though he showed improvement after the January injection, he had not yet returned to "baseline."  (*Id.*)  Claimant's mother further explained he has good days and bad days and memory problems.  (*Id.*)  Claimant complained that he "sees monsters" while sleeping at night.  (*Id.*)  Upon examination, Claimant exhibited disorganized thoughts at times, limited judgment and insight, and a blunted affect.  (R. 612.)  Dr. Gorrepati increased Claimant's Invega injection and recommended that Claimant move back in with his family if he continued to have trouble taking his medications.  (R. 612.)

Claimant was compliant with his Invega injection in February and was "feeling more comfortable since the dosage increase."  (R. 741.)  He was sleeping well and going for walks.  (*Id.*)  He denied hallucinations.  (R. 742.)  Dr. Gorrepati described Claimant as "stable with the medication as long as he is compliant."  (R. 743.)  Claimant continued with his monthly Invega injections through April 2016.  (R. 606, 721.)  However, at a general physical in March 2016, Claimant reported he was only taking his Ativan every other day.  (R. 600.)  Claimant also reported having visual hallucinations since he was a kid.  (R. 601.)  The examining physician noted a very flat affect, and slowness to answer questions.  (R. 603.)  She recommended Claimant follow-up with Dr. Gorrepati.  (R. 604.)  Claimant did so in early May 2016 and reported that the Invega helps keep him calm, though it was possibly causing increased prolactin and gynecomastia.  (R. 936.)  Dr. Gorrepati planned to continue the Invega injections until Claimant had an MRI because it "kept symptoms of psychosis stable."  (R. 938.)

By June 2016, Claimant had switched to Abilify. (R. 906.) On June 2, 2016, Claimant told Dr. Gorrepati that he was more forgetful on Abilify and was having trouble putting sentences together and concentrating. (R. 907.) He told Dr. Gorrepati he went to the ER two weeks prior because "he woke up and forgot how to cook" and had "disorganized thought process[es]." (*Id.*) An MRI in the ER was normal. (*Id.*) Upon mental status exam, Claimant had limited judgment and a restricted mood and affect. (R. 908.) Dr. Gorrepati recommended Claimant continue on Abilify to determine its efficacy. (*Id.*) Two weeks later, Claimant continued to complain of disorganized thoughts though he admitted "there are some days he forgets to take the Abilify." (R. 902-03.) Dr. Gorrepati increased Claimant's Abilify dosage. (R. 904.)

Claimant reported slight improvement a few months later on the increased Abilify dose though he was still forgetting dosages. (R. 883.) He did not want to switch to Abilify injections because he could not afford them. (*Id.*) The following month, Claimant's compliance improved and he reported improved mood, concentration, and thought processes. (R. 873-74.) Dr. Gorrepati described him as "stable with current medication." (R. 875.) In November 2016, Claimant reported he was doing well since his last visit, though he continued to complain of poor memory. (R. 856.) He reported he could grocery shop by himself. (*Id.*) A few months later, he continued to report a stable mood on Abilify. (R. 853.)

On November 8, 2016, Dr. Gorrepati completed a mental residual capacity statement. (R. 834-38.) According to Dr. Gorrepati, Claimant's condition would preclude performance for 10% of an eight-hour day of the following skills: understanding, remembering, and carrying out very short instructions; and

acknowledging and taking precautions for hazards. (R. 835-36.) Additionally, Claimant's condition would preclude performance for 15% or more of an eight-hour work day of: understanding and carrying out detailed instructions; maintaining attention and concentration; maintaining regular attendance; working in coordination and proximity of others; making simple work-related decisions; responding appropriately to changes; and setting goals and making plans independently of others. (*Id*.) According to Dr. Gorrepati, Claimant would be off task more than 30% of an eight-hour workday; would be absent or unable to complete a workday more than five days or more a month; and could complete a full workday on a sustained basis less than 50% of the time. (R. 837.) Consequently, Dr. Gorrepati believed Claimant could not work in a competitive work setting for eight hours a day, five days a week. (R. 838.) Dr. Gorrepati based his opinion on Claimant's history, medical file, and his progress and office notes. (*Id*.)

### 3. Evidence from Agency Consultants

On March 9, 2015, in connection with a previous application, Claimant underwent a consultative examination with psychologist Dr. Glen Wurglitz. (R. 430-32.) At that point, Claimant reported one psychiatric hospitalization, but denied current mental health treatment. (R. 430.) Claimant told Dr. Wurglitz he could maintain his own personal hygiene, cook, wash dishes, perform light housekeeping, and go shopping alone. (R. 431.) He reported difficulty concentrating on tasks. (*Id*.)

Dr. Wurglitz performed a mental status exam and reported a euthymic mood and a "flat affect unable to be altered for any length of time, even with effort." (R. 432.) Claimant exhibited fair short-term memory and judgment, marginal delayed memory, and poor abstract reasoning and general fund of information. (*Id*.) Dr. Wurglitz assessed

schizophrenia and psychosis and contemplated that declines could be expected absent mental health treatment. (*Id*.) Dr. Wurglitz also opined that Claimant could not manage his own funds. (*Id*.)

On November 18, 2015, at the initial level, the state agency consultant concluded that Claimant had moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public. (R. 102-03.) Otherwise, the state consultant found no significant limitations and determined Claimant could perform work in the national economy. (R. 105.) This opinion was affirmed at the reconsideration level in January 2016. (R. 108-118.)

### C.  Evidence from Claimant's Testimony

Claimant appeared with counsel at the May 2017 hearing and testified before the ALJ as follows. Claimant confirmed that he graduated high school and previously took courses at the community college. (R. 44.) But, according to Claimant, he was unable to "comprehend and understand" like he could in high school and he unenrolled. (R. 44-45.) Claimant further explained that he is often confused and has a difficult time focusing and "put[ting] things together the way that they should be." (R. 49.) Claimant has never worked, though he did try to find a job in high school. (R. 44, 64.)

Claimant has lived by himself in an apartment since 2013. (R. 47-48.) His mother pays his rent and utility bills. (R. 50, 66.) Claimant is able to maintain his personal hygiene and sweep and mop his apartment. (R. 53, 56.) Claimant goes to the grocery store once a month for TV dinners and other frozen foods and goes to the dollar store a couple of times a month for cleaning supplies. (R. 51-52.) Claimant also goes to

the library a couple times a month. (R. 58-59.) He's been to the movie theater once in the last six months. (R. 56.) Otherwise, Claimant mostly stays home and reads, watches television and movies. (R. 55.) When Claimant does leave the house, he walks and is able to walk a couple of miles at a time. (R. 56.) Claimant's mother visits once every two weeks but does not help with the upkeep of the apartment. (R. 67.) Claimant does not have any friends. (R. 59.)

When asked about his medical treatment, Claimant explained that he sees Dr. Gorrepati for medication management and to discuss whether or not he is "able to understand what's going on around [him]." (R. 60.) Claimant told the ALJ that Dr. Gorrepati recently switched him from Invega to Abilify, which has helped him "focus a little bit more on certain subjects, such as watching TV." (R. 60-62.) He did tell the ALJ, however, that he often has trouble understanding the movies he watches. (R. 62, 65.) Claimant recalled that he was admitted to the hospital in 2014 and 2015 because he "wasn't as stable" and was "losing [his] mind." (R. 68.) Although he has not had a similar occurrence since 2015, he explained that generally the "hallucinations and schizophrenia" can "become[] a problem for [him]." (R. 69-70.)

**D. Evidence from Claimant's Mother's Testimony**

Claimant's mother, Rozette, provided further testimony regarding Claimant's symptoms and limitations. Rozette confirmed that Claimant has lived by himself for over three years. (R. 73.) She explained that she signed Claimant up for public housing when his condition was not as severe. (R. 74.) Shortly after Claimant moved out, however, his condition worsened and he began to isolate himself. (R. 74-75.) Rozette has been trying to get him to move back home ever since, but Claimant refuses to do so. (R. 76-77.) She

explained that she continues to provide financial support to her son because she is worried what would happen if she cuts him off.  (R. 77, 83.)  She is unable to move in with Claimant because the apartment is a one bedroom and she does not qualify for public housing.  (R. 77-78.)

Rozette testified that Claimant sees Dr. Gorrepati once a month for medication.  (R. 78.)  In her opinion, the medication has not improved Claimant's condition because his "mind is backwards."  (R. 78.)  Rozette explained that she buys Claimant fruits and vegetables because he only buys the same precooked food.  (R. 79.)  She checks on Claimant about four times a month and some of his siblings who live nearby also check on him occasionally.  (R. 79-80.)  Rozette sometimes has to remind Claimant to do the dishes or remind him how to cook.  (R. 82-83.)  Claimant knows how to pay his rent directly to the housing authority office in his building, but she takes care of physically paying the rest of his bills.  (R. 81-82.)

According to Rozette, Claimant spends his days watching television and occasionally goes for short walks.  (R. 80-81.)  As recently as two months prior to the hearing, Rozette observed Claimant scribbling circles on paper because he says it keeps his "thoughts together."  (R. 84-85.)  She confirmed Claimant does not have any friends and explained that in high school he always thought his teachers were looking at him or classmates were trying to fight him.  (R. 85-86.)

### E.  Evidence from the Vocational Expert's Testimony

A vocational expert ("VE") also offered testimony before the ALJ.  The ALJ first asked the VE to consider a hypothetical individual of Claimant's age and education who was limited to: simple and routine tasks performed in a work environment free of fast

paced production requirements; simple work-related decisions and few workplace
changes; no sustained interaction with the public; and only occasional superficial
interaction with co-workers and supervisors. (R. 88.) The VE testified that such an
individual could work in unskilled "cleaning types of positions," such as laundry worker,
cleaner II, and lab equipment cleaner. (*Id.*) The VE further explained that employers
tolerate up to 15% off-task time per day and fourteen absences per year. (R. 89-90.) An
employee who missed more than two days per month could not maintain employment.
(R. 90.)

Upon questioning by Claimant's counsel, the VE testified that an employee who
repeatedly missed the end of the day quota (for example, cleaning five bus interiors)
would be terminated. (R. 91-92.) Employment would also be precluded if the employee
required constant redirection to complete the required tasks or could not understand
simple instructions. (R. 92-93.)

## II. LEGAL ANALYSIS

### A. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's
final decision in federal court. Judicial review of an ALJ's decision is governed by 42
U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social
Security as to any fact, if supported by substantial evidence, shall be conclusive." 42
U.S.C. §405(g). Consequently, this Court will affirm the ALJ's decision if it is supported
by substantial evidence. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). Substantial
evidence "means – and means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Biestek v. Berryhill,* 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1983).

This Court must consider the entire administrative record, but it will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Court will focus on whether the ALJ has articulated "an accurate and logical bridge" from the evidence to his or her conclusion. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate [his or her] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam), *quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

## B. The Standard for Proof of Disability Under the Social Security Act

In order to qualify for benefits, a claimant must be "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage

in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity ("RFC"). 20 C.F.R. §416.920(e). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id*. at 886.

**C. The ALJ's Decision**

The ALJ applied the five-step inquiry required by the Act in reaching his decision to deny Claimant's request for benefits. Before doing so, the ALJ addressed Claimant's prior application and the completeness of the records. With respect to Claimant's prior application, the ALJ concluded that because he "determined that the claimant is not disabled and has not been disabled at any time since the alleged disability onset date…it is unnecessary to consider the issue of reopening" the prior application. (R. 15.) As for

the completeness of the record, the ALJ acknowledged that Claimant was unable to obtain his community college records.  (R. 15-16.)  However, Claimant's own representative indicated that these records were not material to the ALJ's understanding of Claimant's application.  (R. 16.)  Consequently, the ALJ closed the record and proceeded with the five-step inquiry.  (*Id.*)

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his application date.  (R. 18.)  Next, at step two, the ALJ determined that Claimant suffered from the severe impairment of paranoid schizophrenia.  (R. 18.)  At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, including listing 12.03 for "schizophrenia spectrum and other psychotic disorders."  *See* 20 C.F.R. Part 404, Subpart P, App. 1.  In doing so, the ALJ found Claimant had only moderate limitations in understanding remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace; and mild limitations in adapting and managing oneself.  (R. 18-20.)

The ALJ went on to assess Claimant's RFC, ultimately concluding that he had the RFC to perform a full range of work at all exertional limitations, but was limited to simple, routine tasks performed in a work environment free of fast-paced production requirements, and involving only simple work-related decisions with few, if any, workplace changes.  (R. 20.)  The Claimant could have no sustained interaction with the public and only occasional brief and superficial interaction with co-workers and supervisors.  (*Id.*)  At step four, the ALJ determined that Claimant had no past relevant work.  (R. 29.)  Lastly, at step five, the ALJ concluded that given Claimant's age,

education, and RFC, he could perform jobs that exist in significant numbers in the national economy, including the representative occupations of laundry worker, cleaner II, and laboratory equipment. (R. 30.) As such, the ALJ found that Claimant was not under a disability from his application date through the date of his decision. (R. 30.)

### D. The Parties' Arguments in Support of their Respective Motions for Summary Judgment

In his motion for summary judgment, Claimant first argues that the ALJ failed to properly assess the opinion of Claimant's treating physician, Dr. Gorrepati. According to Claimant, the ALJ's decision to give the majority of Dr. Gorrepati's opinion "minimal weight" was based on misinterpretations of the medical evidence. Next, Claimant argues that the ALJ improperly discounted Claimant's mother's testimony as "inconsistent" when no such inconsistencies exist. Lastly, Claimant argues that the ALJ improperly discounted his own subjective symptom allegations.

In response, the Commissioner argues that the ALJ minimally articulated sufficient reasons for discounting Dr. Gorrepati's opinion. With respect to Claimant's mother's testimony, the Commissioner argues that the ALJ was free to rely on the cited inconsistencies. Lastly, the Commissioner argues that the ALJ's assessment of Claimant's symptom allegations was not patently wrong and should be affirmed. Respectfully, the Court disagrees.

### E. The ALJ Failed to Provide Good Reasons for Discounting the Opinion of Claimant's Treating Physician

Claimant argues that the ALJ improperly discounted the opinion of his treating psychiatrist, Dr. Gorrepati. As explained above, *supra* in Section I(B)(2), Dr. Gorrepati opined that Claimant would be precluded during 10% of the workday from

16

understanding, remembering, and carrying out very short instructions. Dr. Gorrepati further concluded that Claimant would be precluded during 15% of the work-day from understanding and carrying out detailed instructions; maintaining attention, concentration, and attendance; working in proximity of others; making simple work-related decisions; responding appropriately to changes; and setting goals and making plans independently of others. Finally, Dr. Gorrepati concluded that Claimant would be off task for more than 30% of an eight-hour workday; absent or unable to complete a workday five days or more a month; and able to complete a full workday on a sustained basis less than 50% of the time.

The opinion of a treating source such as Dr. Gorrepati is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. §404.1527(c)(2). If the ALJ does not afford a treating physician's opinion controlling weight, he must offer "good reasons" for discounting the opinion. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). In doing so, the ALJ must consider: (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the ALJ's attention.[3] 20 C.F.R. §404.1527(c).

---

[3] The SSA abolished the "treating physician rule" on March 27, 2017 when it enacted new regulations and rescinded several rulings. However, the treating physician rule continues to apply to applications filed before March 27, 2017. *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018).

Here, the ALJ gave "some weight" to Dr. Gorrepati's opinion that Claimant is limited to short and simple instructions, but gave the "balance of his opinion minimal weight." (R. 27.) Unfortunately, the ALJ's reasons for doing so fall short of the "good reasons" required under the treating physician rule.

First, the ALJ stated that Dr. Gorrepati's opinion was "not supported by the doctor's own objective clinical findings including generally unremarkable mental status examination[s] when the claimant remains medication [compliant] and the claimant's self report of doing well on multiple occasions." (R. 27.) As Claimant argues, the ALJ's reasoning in this regard rests on a misinterpretation of the record. Indeed, throughout his decision, the ALJ relies on what he views as "unremarkable mental status exams" because Claimant was, at times, described as alert, cooperative, calm, and stable, with intact memory and judgment. On the other hand, the ALJ acknowledged some of Claimant's negative mental status exams when non-compliant such as a flat affect, euthymic or restricted mood, limited judgment, and slowness to respond.[4] Yet, when it was time to assess the opinion of Dr. Gorrepati, the ALJ ignored the possibility that such negative status exams could serve as support for Dr. Gorrepati's opinion. This raises concerns of impermissible "cherry-picking." *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ…cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Furthermore, to the extent the ALJ found Dr. Gorrepati's opinion inconsistent with his description of Claimant as "stable" or Claimant's self reports of doing-well, this reasoning "reveals an all-too-common misunderstanding of mental illness." *Scott v.*

---

[4] As explained below, *infra* at Section II(F), the ALJ failed to properly consider the reasons for those periods of non-compliance.

*Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). As courts have held, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The record before the Court reveals that Claimant, who has a well-documented diagnosis of schizophrenia, certainly suffers from good days and bad days, leaving the ALJ's snapshot approach to discounting most of Dr. Gorrepati's opinion improper. *See Rosalyn L. v. Saul*, No. 3:19 CV 345, 2020 WL 614648, at *10–11 (N.D.Ind. Feb. 10, 2020) ("[T]he implication from the ALJ's citation of a few positive signs here and there in the treatment notes…ignores [the] variable and unpredictable nature [of mental illness].").

Moreover, "[t]he fact that a physician describes a claimant's symptoms as 'stable' does not indicate that [his] condition is less serious than [he] alleges because a person can have a condition that is both 'stable' and disabling at the same time." *Howard v. Berryhill*, No. 17 CV 583, 2018 WL 6529284, at * 9 (internal quotations omitted); *see also Barnes v. Colvin*, 80 F.Supp.3d 881, 889 (N.D.Ill. 2015) ("'Stable' only signifies that [claimant's] condition remained the same over a period of time…[Claimant] could have been 'stable' and non-functional, or 'stable' and fully functional."). Thus, any implication that Dr. Gorrepati's description of Claimant as stable intrinsically undermines his overall opinion is without merit.

The only other reason the ALJ provided for discounting the majority of Dr. Gorrepati's opinion was that it was "further inconsistent with and contradicted by the opinions" of the agency physicians. (R. 27.) But a "contradictory opinion of a non-examining physician does not, by itself, suffice as a justification for discounting the

opinion of the treating physician." *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016) (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)). The Commissioner counters that the ALJ offered reasons beyond the conflicting opinions of the agency physicians. But having already found those other reasons flawed, the opinions of the agency consultants cannot stand alone as substantial justification for discounting the majority of Dr. Gorrepati's findings. On remand, the ALJ must reassess the opinion of Dr. Gorrepati and, if he continues to discount that opinion, must offer good reasons for doing so supported by substantial evidence in the record.

### F. Remaining Issues

Since remand is already required, the Court comments only briefly on Claimant's remaining arguments. First, the Court agrees with Claimant that the purported inconsistencies in Claimant's mother's testimony were not in fact inconsistencies, but resulted from the ALJ taking snippets of her testimony out of context. For example, the ALJ discounted Rozette's testimony because she said she wanted him to move home, but continued to pay his bills. As Rozette specifically explained, she continues to pay his bills because she is afraid of what might happen if she cuts him off completely. The ALJ also found an inconsistency between Rozette's testimony that "she does all [of Claimant's] grocery shopping," that he "knows how to buy precooked food," and that there is "no food in the refrigerator." (R. 29.) But his mother specifically explained that she buys Claimant healthy foods because he will not do so on his own, and even Claimant testified that he runs out of food near the end of each month.

Again, the Court sees no inconsistency in this testimony. Of course, the Commissioner is correct that Claimant's mother is not a medical source, *see* SSR 16-3p,

2017 WL 5180304, at *7, and may have an interest in testifying in a manner to benefit her son. It does not follow, however, that the ALJ is free to discount her testimony as "wholly inconsistent" when the purported "inconsistencies" were simply the result of taking her testimony out of context. On remand, the ALJ shall reconsider Rozette's testimony and, if he continues to discount that testimony, must provide a "logical bridge" to support his finding. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

Second, the ALJ appeared to reject Claimant's symptom allegations – at least in part – because of his daily activities, which included visits to the store, occasional walks, light cleaning and cooking, watching television, and reading books. While the ALJ is free to consider a claimant's daily activities when assessing his symptom allegations, *see* SSR 16-3p, 2017 WL 5180304, at *7, the Seventh Circuit has repeatedly warned ALJs not to "disregard a claimant's *limitations* in performing household activities." *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (emphasis added).

Here, Claimant performed his daily activities with limitations. For example, Claimant spent much of his time watching movies, but watched them over and over because he had trouble understanding them. He also testified to buying and preparing mostly pre-cooked foods, and the record includes evidence that he once reported to the ER because he forgot how to cook. On this record, the Court is left wondering how the ALJ believed Claimant's minimal daily activities, performed with limitations, translate to an ability to perform full-time work. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir.

2011) ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace."). On remand, the ALJ shall carefully reconsider Claimant's daily activities to determine how, if at all, those activities support his findings. *Roddy*, 630 F.3d at 712 (the ALJ's consideration of daily activities "must be done with care.").

Lastly, although the parties do not address this issue aside from one passing reference by the Commissioner (Dckt. #21 at 6-7), the Court would be remiss not to address the ALJ's repeated description of Claimant's symptoms when he is *compliant* with his medication. *See Mangan v. Colvin*, No. 12 C 7203, 2014 WL 4267496, at *1 (N.D. Ill. Aug. 28, 2014) ("[A] reviewing court may *sua sponte* address issues in social security cases."). As discussed above, the record does reveal that Claimant's symptoms often improved with medication. But the record also includes numerous references to Claimant's failure to take his medication. *See e.g.* R. at 456 (Claimant's mother describes a history of non-compliance); R. at 650 (Claimant stopped taking medications because "he was taking too much medicine"); R. at 611 (missed Invega injection); R. at 612 (Dr. Gorrepati recommended Claimant move back home if he continued to have trouble taking his medications); R. at 600 (Claimant reported taking Ativan only every other day); and R. at 883 & 904 (Claimant twice reported forgetting to take Abilify).

Although the ALJ acknowledged Claimant's instances of non-compliance, he failed to consider whether Claimant's mental illness might play a role in his failure to keep up with his medication regimen. As the Seventh Circuit has recognized, "mental illness in general…may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630–31 (7th Cir.

2006) (citations omitted).  Where, as here, the Claimant was twice hospitalized for severe

psychosis when *not* on medication, it is important for the ALJ to consider any reasons for

non-compliance and, even more importantly, to consider how periods of non-compliance

might affect Claimant's ability to maintain employment.[5]  *See Minniefield v. Astrue*, No.

1:09-CV-35, 2010 WL 148244, at *9 (N.D.Ind. Jan. 12, 2010) (ordering remand where

the ALJ failed to consider the possible reasons for Claimant's non-compliance with his

treatment regimen).  On remand, the ALJ should consider whether Claimant's

schizophrenia may play a role in his non-compliance and determine how continued

periods of non-compliance may affect his RFC.

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment (Dckt. #17)

is granted and the Commissioner's motion for summary judgment (Dckt. #20) is denied.

This case is remanded to the Social Security Administration for further proceedings.  On

remand, the ALJ shall (1) reassess the opinion of Dr. Gorrepati; (2) reconsider Claimant's

mother's testimony; (3) reassess Claimant's daily activities and his limitations in

performing those activities; and (4) consider how, if at all, Claimant's mental

impairments affect his compliance and how any periods of non-compliance affect his

RFC.  It is so ordered.

**ENTERED:   October 13, 2020**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

---

[5]  The ALJ did opine that Claimant's "symptoms may increase" during "intermittent brief periods
of missed medication," though not to a disabling level.  (R. 26.)  But, again, the ALJ seemingly
ignored the possibility that Claimant's documented pattern of non-compliance may negatively
impact his RFC.